**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**YVONNE CRAWFORD COX,**

     **Plaintiff,**

**vs.**                           **Case No.  1:12cv173-RH/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner, Social Security
Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Acting Commissioner (Commissioner) of the Social

Security Administration (SSA) denying Plaintiff's application for Disability Insurance

Benefits (DIB) under Title II of the Social Security Act.  After careful consideration of the

record, it is respectfully recommended that the decision of the Commissioner be

affirmed.

**I.  Procedural History**

On September 25, 2007, Plaintiff, Yvonne Crawford Cox, filed an application for a

period of disability and DIB, alleging disability beginning on February 8, 2007, based on

"back, neck, carpal tunnel, heart, diabetes, shoulder, cancer heart, chest pain."  Doc.

40-2 at 32; Doc. 41-6 at 2-1; Doc 42-1 at 42. (Citations to the record on CM/ECF shall be by the symbol "Doc." followed by a page number that appears at the top of each page.)[1] Plaintiff's date last insured, or the date by which her disability must have commenced in order to receive benefits under Title II, was December 31, 2012. Doc. 40-2 at 32.

Plaintiff's application was denied initially on January 22, 2008, and upon reconsideration on May 12, 2008. Doc. 40-2 at 32; Doc. 41-5 at 7-11. On or about June 11, 2008, Plaintiff requested a hearing. Doc. 40-2 at 32, 90-95; Doc. 41-5 at 12-13. At this time, Plaintiff was represented by Jonathan I. Rotstein, an attorney, who no longer represented Plaintiff on or about May 11, 2009. Doc. 41-5 at 13-15. As of July 24, 2009, Plaintiff was represented by Judith M. Nagan, an attorney. Doc. 40-2 at 53-56, 89; Doc. 41-5 at 16-17, 47-48.

On March 10, 2010, Plaintiff appeared and testified at a hearing conducted in Tallahassee, Florida, by Administrative Law Judge (ALJ) John W. Belcher. Doc. 40-2 at 32-44, 54-88. Plaintiff was represented by Ms. Nagan. Doc. 40-2 at 32, 53-55. Richard B. Hall, a vocational expert, testified. Doc. 40-2 at 54, 80-86; Doc. 41-5 at 18 (Resume).

On April 23, 2010, the ALJ issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from February 8, 2007, through the date of the decision, the relevant period. Doc. 40-2 at 43-44. On September 1, 2010, Ms. Nagan advised Plaintiff that she was withdrawing as Plaintiff's representative. Doc. 40-2 at 18. On September 13, 2010, N. Albert Bacharach, Jr., and Pamela C. Dunmore

---

[1] The page numbers appearing in the lower right hand corner are not consistently legible.

were appointed to represent Plaintiff. Doc. 40-2 at 19-21. On or about February 11, 2011, Plaintiff discharged Mr. Bacharach and Ms. Dunmore, doc. 40-2 at 16-17; doc. 42-2 at 9-11, and thereafter Plaintiff has appeared pro se with respect to this matter.

On May 24, 2012, the Appeals Council denied Plaintiff's request for review, doc. 40-2 at 2-5, and stated in part:

> In looking at your case, we considered the reasons you disagree in your statement dated February 11, 2011, [Doc. 42-2 at 11] listed on the enclosed Order of Appeals Council (Exhibit 18E) [Doc. 42-2 at 6-13]. We found that the Administrative Law Judge adequately considered and evaluated the evidence, and there is no basis for changing the Administrative Law Judge's decision.
>
> We also looked at the evidence you submitted, including the June 6, 2011[,] letter from Asad U. Qamar [Doc. 40-2 at 15].[2] The Administrative Law Judge decided your case through April 23, 2010. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before April 23, 2010.
>
> If you want us to consider whether you were disabled after April 23, 2010, you need to apply again. The evidence can be found in the electronic claim file should you wish to pursue a subsequent application.

Doc. 40-2 at 3. The ALJ's decision stands as the final decision of the Commissioner.

On July 23, 2012, Plaintiff, appearing pro se, filed a Complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. On December 19, 2012, Plaintiff filed a Third Amended Complaint and an Order Directing Service and Summons was issued on December 27, 2012. Docs. 22 and 23. Thereafter, Plaintiff filed numerous motions, requests, and responses, including motions for extensions of

---

[2] In a subsequent decision entered by ALJ Gregory J. Froehlich in February of 2013, *see* below, the ALJ gave substantial weight to the June 6, 2011, opinion offered by Dr. Qamar. Doc. 35 at 9; *see infra* n.7. Dr. Qamar notes that Plaintiff was under his care for her cardiovascular condition which included coronary artery disease and that Plaintiff first came to see him on *February 24, 2011.* Doc. 40-2 at 15. ALJ Froehlich concluded that Plaintiff was disabled since *February 24, 2011.* Doc. 35 at 10. Plaintiff was represented by Claudeth Henry, an attorney, before ALJ Froehlich. Doc. 35 at 6.

time to file her memorandum.  Numerous orders have been entered in response to Plaintiff's motions.

On February 14, 2013, Plaintiff filed a motion to correct earnings.  Doc. 35. Plaintiff attached to the motion a copy of the February 11, 2013, Notice of Decision and the Order of Administrative Law Judge entered by ALJ Froehlich.  ALJ Froehlich determined that Plaintiff had been under a disability since *February 24, 2011*, *see supra* n.2 and *infra* n.7, the amended alleged onset date of disability, through the date of his decision, doc. 35 at 6-10.  (The last page of the ALJ's decision is omitted.  Doc. 35 at 10.)  On February 15, 2013, an Order to Show Cause was entered requesting clarification regarding whether the case before this Court was moot or prematurely filed. Doc. 36 at 1.  Plaintiff filed a response, doc. 37, and an Order was entered on March 8, 2013, denying the motion to correct earnings.  Doc. 38.

On April 29, 2013, an Order was entered that, in part, addressed Plaintiff's statement that she "had filed two separate applications for Social Security Disability and Medicaid benefits."  Doc. 49 at 2.  This Order also stated that Plaintiff had also represented that her second application "was 'approved January 22, 2013,' suggesting that if this case concerned that application, the case was moot.  *Id.*"  Doc. 49 at 2.  This Court noted:

> The administrative record submitted by the Defendant does not provide clarification as to these events which Plaintiff contends have occurred in 2013. The record provides information only as to proceedings which ended in a May 23, 2012, notice from the Appeals Council which denied Plaintiff's request for review and made the ALJ's decision the "final decision of the Commissioner" for Plaintiff's case.  Doc. 40-2 at 2-5.  Considering that Plaintiff is once again asserting that she has been "found fully disabled," doc. 48 at 2, Defendant is requested to file a response to this Order to clarify whether the two separate applications Plaintiff has noted are separate and distinct from the proceeding under review in this case.

Doc. 49 at 3.  On May 7, 2013, Defendant filed a response to the latter Order and

explained:

> Plaintiff filed an application for disability insurance benefits under Title II on September 25, 2007 (Tr. 463-65).  An [ALJ] issued an unfavorable decision finding Plaintiff was not disabled on April 23, 2010 (Tr. 31-43).  The Appeals Council denied Plaintiff's request for review on May 24, 2012 (Tr. 1-6).  The ALJ's April 23, 2010 decision is the subject of the current civil action.
>
> While Plaintiff's claim was pending with the Appeals Council, she filed a new application on April 5, 2011.  *On February 8, 2013, an ALJ issued a favorable decision finding that Plaintiff was entitled to disability benefits as of February 24, 2011.*  [*See* doc. 35 at 2-10].
>
> A review of Agency records does not show any additional applications within the last five years.  Additionally, the records do not show that there was any hearing scheduled for or held on March 12, 2013.  Thus, the ALJ's April 23, 2010 decision is properly before this Court.

Doc. 50 at 1-2 (emphasis added).

On July 15, 2013, this Court entered another Order in response to several

motions filed by Plaintiff.  Doc. 69.  Relevant here, this Court stated:

> Plaintiff's final motion is "to include all documentations . . . filed, submitted 2005 to 2013."  Doc. 68.  That motion is denied.  Plaintiff's case was filed in this Court in 2012 and concerns the denial of Plaintiff's 2007 application for benefits which was entered in an unfavorable decision by the [ALJ] on April 23, 2010.  If Plaintiff is aware of a *specific* page which has been omitted from the record, Plaintiff must first confer with opposing counsel to obtain that page, clearly identifying a relevant document from her 2007 application.

Doc. 69 at 2.

On November 22, 2013, an Order was entered granting Plaintiff's fourth motion

requesting additional time to file her memorandum, granting Plaintiff until December 9,

2013, to file her memorandum.  Doc. 78.  Plaintiff filed a three-page memorandum on

December 9, 2013.  Doc. 81.  On December 31, 2013, Defendant filed a memorandum.

Doc. 83.  Both memoranda have been considered.  On January 10, 2014, Plaintiff filed

a memorandum, which includes a "Re-submission Records of evidence," but no

additional argument why these records demonstrate that the ALJ erred.  Doc. 84.

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.  A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'"  Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the residual functional capacity [RFC] to perform work despite limitations and are any impairments which prevent past relevant work?

     5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

     As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear. 20 C.F.R. § 404.1527. When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication than an examining physician presented "the *only* medical evidence submitted pertaining to the

relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053. The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or

laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

## III.  Legal Analysis

### A.  Substantial evidence supports the ALJ's decision.

1.

As a threshold issue, Plaintiff mentions in her memorandum that she received a fully-favorable Notice of Decision dated February 11, 2013, "due to onoing illnesses as far back as 1998-2007 pages 3 through 6 indicate the facts, diagnosis, steps for determination and rules stated and followed by [P]laintiff per decision and ongoing disabilities."[4]  Doc. 81 at 1; *see supra* at 3-5.  Plaintiff further states that she has several impairments in addition to the impairments found by ALJ Belcher, including "hpylori [sp] disease, colitis, cancer, memory loss and more."  Doc. 81 at 2.  It appears that Plaintiff argues that the findings and determination made in February of 2013 should have been found by ALJ Belcher, and, as a result, ALJ Belcher's April 23, 2010, decision should be reversed.

Decisions of the ALJ are reviewed to determine whether the claimant is entitled to benefits during a specific period of time, which period is prior to the date of the ALJ's decision, here April 23, 2010.  *See* Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) (per curiam); Cassidy v. Comm'r of Soc. Sec., 383 F. App'x 840, 842 (11th Cir. 2010) (unpublished); Anderson v. Astrue, No. 5:06cv192/SPM/EMT, 2007 WL 5002066, at *12 (N.D. Fla. Nov. 9, 2007).  The relevant period for this Court's consideration is the

---

[4]  On May 7, 2013, Defendant advised the Court that Plaintiff received a favorable decision by an ALJ on *February 8, 2013*, finding Plaintiff was entitled to disability benefits as of *February 24, 2011*.  Doc. 50 at 1 (emphasis added); *see supra* at 4-5 and n.2; *see also* doc. 35 at 6-10 (ALJ Froehlich's decision).

time-period *prior* to ALJ Belcher's decision.  Plaintiff's subsequent favorable decision

entered nearly three years after ALJ Belcher's decision does not show that the ALJ's

April 23, 2010, decision is erroneous.  *See* Carroll v. Soc. Sec. Admin., 453 F. App'x

889, 892-93 (11th Cir. 2011) (per curiam) (unpublished).  Moreover, sentence six of 42

U.S.C. § 405(g) provides that the district court may remand the case to the

Commissioner for "additional evidence to be taken before the Commissioner . . . but

only upon a showing that there is new evidence which is material and that there is good

cause for the failure to incorporate such evidence into the record in a prior proceeding."

*See* Allen v. Comm'r of Soc. Sec., 561 F.3d 646, 653 (6th Cir. 2009); *see also* Bradley

v. Bowen, 809 F.2d 1054, 1057-58 (5th Cir. 1987).  Plaintiff has not provided the

required good cause.  As a result, a subsequent award is not relevant.  Remand for re-

consideration of the subsequent award of benefits is not required.

2.

At step one, the ALJ determined that "[t]he claimant has not engaged in

substantial gainful activity since February 8, 2007, the alleged onset date."  Doc. 40-2 at

34.[5]

At step two, the ALJ determined that "[t]he claimant has the following severe

impairments: Bilateral Carpal Tunnel Syndrome, Somatoform Disorder, Mild Asthma,

Mild Sleep Apnea, and Benign Paroxysmal Positional Vertigo."[6]  *Id.*  The ALJ stated that

---

[5] The ALJ determined that "[t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2012."  *Id.*

[6] At step 2, the issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily

each of these impairments are severe "because they cause significant limitation in the

claimant's ability to perform basic work activities." *Id.* The ALJ also determined that

several other medical issues were non-severe. To this end, the ALJ referred to the

record in detail as follows. Doc. 40-2 at 34-37.

> I find that the claimant's status post concussion and resulting alleged *headaches* are not severe. On February 8, 2006, the claimant suffered a concussion after she slipped on ice and landed on her head. Exhibit 12F page 8. She complained of headaches, but a computerized tomography (CT) scan of her head was negative, and she was cleared to return to work on February 13, 2006, Id. page 1-2. On August 30, 2006, the claimant underwent a magnetic resonance imaging (MRI) scan of her brain. Exhibit 57F. The results were read by Preston Lotz, M.D., who opined that they showed no intracranial abnormality. Id. On June 1, 2007, the claimant underwent a second MRI scan of her brain that was interpreted as normal by Jeffrey Bush, M.D. Exhibit 27F page 4. On November 27, 2007, Bernie Marrero, Ph.D. opined that the claimant's concussion was mild. On February 9, 2008, the claimant had a computerized tomography (CT) scan of her head. Raymond Larue, M.D., interpreted the results, and he opined that they were normal. Exhibit 56F page. The overwhelming weight of the objective medical evidence in this case supports my finding that the claimant's headaches are not severe.

> I find that the claimant's *hiatal hernia* is not severe. According to the claimant's medical providers, her hiatal hernia does not require surgery or aggressive treatment, and it does not interfere with the claimant's daily activities. Exhibit 28F page 6. The objective medical evidence indicates that this condition is not severe, and I conclude that it is not severe.

> I find that the claimant's *lower back pain* is not medically determinable. The claimant provided records of a work related back injury that occurred in 1989, Exhibit 40F. However, there is no objective medical evidence: x-rays, MRI scans, or other medical tests substantiating the claimant's alleged back pain. I note that the claimant did see a chiropractor for back pain; however, those records indicate that the claimant stopped seeking treatment in June, 2007. The

---

perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274. The ALJ is not required, however, to identify all of the impairments that should be considered severe. *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished).

claimant's cessation of treatment for her back pain is inconsistent with her current allegations of severe back pain. The claimant's cessation of treatment and the lack of objective medical evidence substantiating her allegations of back pain lead me to find that her claims of severe back pain are not medically determinable.

I find that the claimant's *neck pain* is not medically determinable. There are remote medical records from October, 2002, and April, 2003 showing that the claimant was treated for a whiplash type injury and associated neck pain. Exhibit l4F page 14. In January, 2002, the claimant's Magnetic resonance imaging scan of her cervical spine was unremarkable. Exhibit 49F page 5. There are no other records showing any further treatment for neck pain since that time. Given the complete lack of further treatment for her neck pain since 2003, I conclude that her neck pain is not medically determinable.

I find that the claimant's *shoulder pain* is not medically determinable. There are no medical records indicating that the claimant was ever treated for shoulder pain, and I find that her shoulder pain is not medically determinable.

I find the claimant's *diabetes mellitus* is not medically determinable. In treatment records from August, 2007, Sandra Seymour, Ph.D., A.R.N.P., noted that the claimant was insistent that she had diabetes, however the test results did not support it. In January, 2008, the claimant asked Denise Schentrup, A.R.N.P. to review her medical records for evidence of diabetes. The claimant also reported concerns with her liver, her kidneys, and "worms" in her gut. Ms. Schentrup also notes the fact that the claimant was insistent that she has diabetes despite the fact that testing did not show it. Exhibit 17F page 3 and exhibit 28F page 3. The objective medical evidence in this case supports the finding that the claimant's diabetes mellitus is not medically determinable.

I find the claimant's complaints of *cardiac related chest pain* are not medically determinable. The claimant provided records as far back as, 2004 showing her complaints of chest pain. Steven Kraft, M.D. opined that the claimant's echocardiogram (ECG), taken on April 20, 2004, showed normal results. Exhibit 3F page 6 and 11. The claimant underwent a second ECG on August 24, 2005. James O'Meara, M.D., interpreted the results as normal, and he opined that the claimant has a low likelihood of coronary artery disease. Exhibit SF page 3. On October 3, 2005, the claimant underwent a chest computerized tomography (CT) scan of her chest. F. Patlovich, M.D. opined that the results only showed minimal posterior pleural based scarring. Exhibit 14F page 19. On November 3, 2005, the claimant underwent an abdominal aortogram with Dr. O'Meara. Id. page 28. The results were normal with no evidence of atherosclerotic disease. Id. page 29. On November 27, 2005, the claimant reported to the emergency room complaining of chest pain in her left chest area. Exhibit 51F. A chest x-ray was performed, but according to Theodore Nicholson, M.D., it showed negative

findings. Id. page 5. The claimant then left the hospital against medical advice. Id. page 6.

On March 31, 2006, the claimant underwent a holter monitor test. Exhibit 5F. Dayne Piercefield interpreted the results as normal with no abnormalities. Dr. Piercefield noted that the claimant recorded numerous diary entries complaining of chest burning, spasms, palpitations, fluttering, shaking, and chest tightness, but there were no abnormalities in the study to correlate with the complaints. Id. page 14. On April 1, 2006, the claimant underwent another ECG that Otakar·Quadrat, M.D. interpreted as normal. Id. page 13. On April 3, 2006, the claimant underwent an arterial Doppler evaluation and an adenosine myocardial scan. Alexander Rim, M.D. opined that the claimant's results to her arterial Doppler evaluation were normal, and Gregory Imperi, M.D. opined that the results of her myocardial scan were normal. Id. page 12. The claimant complained of heart palpitations, so from June 28, 2006 through August 2, 2006, the claimant was hooked to an event recorder to record cardiac abnormalities. The test was supervised by Dr. O'Meara, and he opined that there was no evidence of cardiac arrhythmia contributing to the claimant's "perceived palpitations." He opined that the claimant's perceived palpitations and fluttering all corresponded to normal sinus rhythm. Id. page 4. On August 2, 2006, Dr. O'Meara opined that the claimant's "palpitations" were not cardiac in origin, he felt that she needed no further cardiac evaluation, and he discontinued treating the claimant. Exhibit 9F page 2. Dr. O'Meara was the claimant's treating cardiologist from January 20, 2005 through August 2, 2006. After undergoing almost all available cardiac related objective medical tests, there is no evidence supporting the claimant's assertions of chest pain, and Dr. O'Meara opined that her "perceived palpitations" were not cardiac related. I find that Dr. O'Meara's opinion is well supported, and I accord it great weight.

On July 2, 2007, the claimant sought treatment for chest pain from Dr. Seymour. The claimant lied to Dr. Seymour and told him that Dr. O'Meara said that she has "serious heart problems." Exhibit 28F page 12. Dr. Seymour opined that the claimant's heart appeared normal per the ECG, and after reviewing Dr. O'Meara's treatment notes, she opined that the claimant had no cardiac abnormality. Id. After hearing that, the claimant asked Dr. Seymour for a referral to a kidney doctor because "she thinks she has kidney problems." Id. page 13. On July 19, 2007, the claimant went to the emergency room for chest pains. While there, she had numerous tests that all were normal including: a chest x-ray, an ultrasound, and an ECG. Exhibit 12F page 31. Carey Barber, M.D., opined that the claimant's chest pain was "GI in origin." Id. page 36. On May 22, 2009, the claimant complained of chest pain, and another chest CT scan showed no acute cardiopulmonary abnormality. Exhibit 65F page 6. Looking through this vast record, there is no evidence indicating that the claimant actually suffers from cardiac related chest pains. The claimant has undergone numerous tests and an aortogram procedure, and there is no evidence that she has any cardiac abnormalities that could possibly cause chest pain. Thus, given

the large number of objective medical tests indicating that there is no medical problem with her heart, I find that her complaints of cardiac related chest pain are not medically determinable.

I find the claimant's *abdominal pain* is not medically determinable. On May 31, 2006, the claimant underwent a colonoscopy after complaints of abdominal pain in her right lower quadrant. Exhibit 5F. Gabu Bhardwaj, M.D., interpreted the results and opined that the claimant's colon was normal. Id. page 10 and Exhibit 7F pages 7-9. On June 9, 2006, the claimant underwent a small bowel follow-through x-ray as a follow up to her colonoscopy. D.E. Ware, M.D., interpreted the results and opined that they were unremarkable. Exhibit 57F page 2. Given the lack of evidence regarding her abdominal pain, I find that it is not medically determinable.

Doc. 40-2 at 34-37 (emphasis added).

Plaintiff alleges that the ALJ step two finding is incorrect because ALJ Froehlich found in a February of 2013 decision, doc. 35 at 8, that Plaintiff had several severe impairments such as coronary artery disease, peripheral artery disease, claudication [referenced by Plaintiff but not included], diabetes mellitus with peripheral neuropathy, history of obstructive sleep apnea on CPAP therapy, asthma, history of bilateral carpal tunnel syndrome status post-surgical release but continue, benign paroxysmal positional vertigo, major depressive disorder, generalized anxiety disorder, and somatoform disorder. Doc. 81 at 1; Doc. 35 at 8.[7] ALJ Belcher found Plaintiff had several "severe" impairments such as bilateral carpal tunnel syndrome, somatoform disorder, mild asthma, mild sleep apnea, and benign paroxysmal positional vertigo. Doc. 40-2 at 34. He considered several other of Plaintiff's complaints/ailments such as headaches, hiatal hernia, neck and cardiac related chest pain, and abdominal pain and found them to be non-severe. Doc. 40-2 at 34-37; *see also* doc. 42-1 at 42 (*see, e.g.,*

---

[7] In assessing Plaintiff's RFC, ALJ Froehlich gave "substantial weight to the June 6, 2011 opinion offered by Dr. Qamar." Doc. 35 at 9. The Appeals Council "looked at" this letter in its May 4, 2012, action letter, but noted that it "is about a later time" -- after ALJ Belcher's April 23, 2010, decision and, as a result, did not affect that decision. Doc. 40-2 at 3.

"[b]ack, neck, carpel tunnel, heart, diabetes, shoulder, cancer, heart, chest pain"

(Plaintiff's allegations re identified limitations on her ability to work)).  ALJ Belcher

discussed Plaintiff's "diabetes mellitus" and found that it was "not medically

determinable" and non-severe.  Doc. 40-2 at 35.  These impairments were considered

in light of the evidence but found to be non-severe because they, for the most part,

lacked confirmation through diagnostic testing.  Doc. 40-1 at 34-37.  *See* 20 C.F.R.

§§ 404.1528(a), 404.1529(a); Dixon v. Barnhart, 151 F. App'x 810, 812 (11th Cir. 2005)

(unpublished) (ALJ properly found claimant did not have "severe" physical or mental

impairments because impairments were not confirmed through objective medical

evidence).

As previously concluded, the findings of Plaintiff's subsequent favorable decision

are not relevant to ALJ Belcher's decision under review in this case.  *See supra* at 11-

12.  As noted, ALJ Belcher considered Plaintiff's complaints/ailments and found several

were severe, but others non-severe.  Substantial evidence supports the ALJ's step two

findings.

3.

At step three, the ALJ determined that "[t]he claimant does not have an

impairment or combination of impairments that meets or medically equals one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Doc. 40-2 at 37.

> In making this finding, I have given particular consideration to the claimant's *physical impairments, as well as her mental impairments* (see Sections 1.00, et seq., Musculoskeletal, 3.00, et seq., Respiratory, 4.00, et seq., Cardiovascular, 5.00, et seq., Digestive, 9.00, et seq., Endocrine, and 12.00, et seq., Mental Disorders).  Despite the claimant's combined impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.07. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within I year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. The claimant's [sic] is able to do the following activities: dressing herself, laundry, vacuuming, folding clothes, cleaning the bathroom, cleaning her bedroom, cooking meals, completing homework, bathing, and taking care of her other personal care and grooming. All of these activities suggest that the claimant's proper level of restriction in her activities of daily living is mild.

In social functioning, the claimant has mild difficulties. The claimant attends church 3 days per week, reads her Bible, teaches Bible classes, writes poems, and does research on her home computer. She also testified that she does go shopping for food and other personal items, and in her medical records, it is indicated that the claimant attends church retreats. All of these factors suggest that the proper limitation for the claimant's social functioning is mild.

With regard to concentration, persistence or pace, the claimant has mild to moderate difficulties. The claimant alleges that she has significant difficulties in concentration, but the evidence does not support this assertion. Looking at her schooling since her alleged onset date, her grade point average actually went up from a 2.4 to a 2.7. Additionally, there is only evidence of one accommodation that was granted to the claimant at school, and it occurred before her alleged onset date. Thus, the evidence supports the fact that the claimant's concentration, persistence and pace have not been as adversely affected as alleged by the claimant, and the proper limitation is mild to moderate.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

Doc. 40-2 at 37-38 (emphasis added).

Plaintiff argues that the ALJ erred at step three.  Doc. 81 at 1.  Plaintiff alleges that she has an impairment that meets or equals a listing in severity and that this is shown by the diagnoses of each of her impairments in the record.  *Id.*

The Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, describe for each of the major body systems impairments that the Commissioner considers to be severe enough to prevent an individual from doing any gainful activity regardless of age, education, or work experience.  20 C.F.R. § 404.1525(a).  The severity standards for a listing-type impairment are high.  *See* Sullivan v. Zebley, 493 U.S. 521, 531-32 (1990).  Generally, an impairment "cannot meet the criteria of a listing based only on a diagnosis.  To meet the requirements of a listing, [the claimant] must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."  20 C.F.R. § 404.1525(d).

The ALJ found that Plaintiff did not have any impairments that satisfied all of the criteria of the listings, including the listings for musculoskeletal impairments, respiratory impairments, cardiovascular impairments, digestive impairments, endocrine disorders, and mental disorders.  Doc. 40-2 at 37-42.  Substantial evidence supports these findings.  *Id.*

4.

At step four, the ALJ assessed Plaintiff's Residual Functional Capacity [RFC]

finding that Plaintiff

> has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant cannot lift or carry more than 10 pounds occasionally, and she cannot lift or carry less than 10 pounds frequently. She cannot push or pull greater than 10 pounds occasionally and less than 10 pounds frequently. The claimant must have an, at will, sit/stand option. She can stand or walk for 4 hours out of an 8-hour day, and she can sit for 6 hours out of a an 8-hour day. She can occasionally: climb stairs, balance, bend, stoop, kneel, crouch, crawl, and reach above her head bilaterally. She cannot climb ladders, climb ropes, and climb scaffolding. The claimant must have no power forceful gripping bilaterally. The claimant cannot perform power gripping or torquing, but she can occasionally flex and extend her wrists bilaterally. She must avoid concentrated exposure to noise, and she must avoid frequent exposure to fumes, odors, dusts, toxins, gasses, poor ventilation, hazardous or fast machinery, unprotected heights, driving, and pools of water. The claimant must avoid concentrated exposure to bright lights. The claimant can do simple tasks and some moderately complex work. The claimant must have a habituated work setting and an object oriented setting.

Doc. 40-2 at 38.

The ALJ considered record evidence including Plaintiff's hearing testimony and

relevant medical evidence in part as follows. Doc. 40-2 at 38-42.

> At the hearing, the claimant testified substantially as follows: she suffers from: migraine headaches, asthma, severe lower back pain, vertigo, dizziness, shortness of breath, sleep apnea, carpal tunnel syndrome, memory problems, concentration problems, diabetes mellitus, gastritis, and a hiatal hernia. She alleges that her impairments cause: problems gripping things, trouble opening and cutting things, and trouble sleeping. Her pain is aggravated by moving around, and she alleges that she cannot: walk farther than 1 block, sit longer than 1 hour, bend, reach without pain, stoop, or crawl. The claimant testified that certain orders or fragrances can trigger an asthma attack. She testified that she hurt her back in 1987, and she has severe low back pain if she works more than 1 to 2 hours without a 30 minute break. The claimant testified that she goes to church on Wednesdays and Sundays, cooks, folds laundry, makes her bed, takes care of her personal grooming, but she has trouble following detailed instructions.

On May 29, 2006, the claimant was diagnosed by Jorge Camacho, M.D. with mild obstructive sleep apnea. Exhibit 5F.

On October 26, 2007, the claimant completed Form SSA-3373 Function Report - Adult.  Exhibit 5E.  In it, she states that she: drives, dresses herself; does laundry, vacuums, folds clothes, cleans the bathroom, cleans bedrooms, cooks meals, works 12 hours per week, goes to school on every Thursday and 1 Tuesday per month, completes homework, bathes, and takes care of her personal care and grooming. She also goes shopping for food and personal items.  She attends church 3 days per week, reads her Bible, teaches Bible classes, writes poems, and does research on her home computer.  She stated that she can walk 2 to 3 blocks at a time.

On October 30, 2007, the claimant underwent a neuropsychological evaluation with Bernie Marrero, Ph.D.  Dr. Marrero diagnosed the claimant with somatization disorder and assessed her global assessment of functioning at 75. Exhibit 19F page 6.  Dr. Marrero performed a clinical interview and administered a number of tests including: Wechsler abbreviated scales of intelligence, and the Wechsler memory scale III.  Id. page 3.  Dr. Marrero opined that the claimant's deficits in learning and memory were always present, surfaced due to the challenges she is facing in college, and are not attributable to her concussion.  Id.  I find that Dr. Marrero's opinion is well supported and I accord it great weight.

On December 28, 2007, Lauriann Sandrik, Psy.D., completed a psychiatric review technique on the claimant. In it, she concluded that the claimant had non-severe impairments.  She determined that the claimant has somatoform disorder, and found she has mild limitations in all three of the functional areas with no episodes of decompensation.  I disagree with Dr. Sandrik that the claimant's somatoform disorder is not severe, and I give her opinion little weight.

On January 7, 2008, the claimant underwent a consultative physical examination with Lance Chodosh, M.D.  During the exam, Dr. Chodosh reviewed the claimant's medical records and performed a physical examination of the claimant. He noted that the claimant had normal gait, normal heel and toe walk, negative straight leg raising test, normal standing balance, but she had limited restricted range of motion in her back.  However, Dr. Chodosh opined that, based on the objective evidence, the claimant is able to stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear, and speak normally. Exhibit 23F page 9.  While I do not give full weight to Dr. Chodosh's opinion, I do believe that the claimant is not as limited as she claims.

On February 6, 2008, the claimant underwent an electronystagmograph to determine the cause of her vertigo, loss of balance, light-headedness, and blurred vision.  Exhibit 26F and 60E.  Thomas Williams, Ph.D. diagnosed the claimant with left atypical paroxysmal positional vertigo.  Id. page 9.  On April 16, 2008, Dr. Williams completed a request for work capacities-upper extremities for

the claimant. Id. page 5. Dr. Williams indicated that the claimant could return to regular work with no limit on the maximum number of hours that she could work in a day. Id. He identified no functional limitations, and opined that the claimant had achieved maximum medical improvement. Id. page 6. The claimant also received treatment from George Feussner, M.D. for her dizziness and vertigo. Exhibit 30E. He noted that on April 2, 2008, the claimant came in reporting she had "drainage" from her head. However, upon examination, Dr. Feussner found no abnormality. Id. page 5.

A physical residual functional capacity (RFC) assessment by Vaduvur Narayan, M.D., was prepared at the request of the agency on May 8, 2008. Exhibit 37F. Dr. Narayan opined that the claimant could perform the full range of light exertional work related activities except she could only occasionally: climb ramps, balance, stoop, kneel, crouch and crawl. He opined that she should never climb ladders ropes and scaffolds due to her paroxysmal benign positional vertigo. Id. page 3. He also opined that she should avoid concentrated exposure to noise and avoid moderate exposure to hazards due 10 her benign paroxysmal positional vertigo. Id. page 5. Dr. Narayan noted that the claimant has multiple symptoms with no con elating objective medical evidence substantiating her claims. I give Dr. Narayan's opinion great weight as reflected in the above residual functional capacity.

On May, 21, 2009, the claimant was admitted to the hospital to treat her asthma. She also complained of right sided chest pain, shortness of breath, chronic right low back pain.

On May 27, 2009, the claimant underwent a sleep study. The results were interpreted by James Wynne, M.D., and they showed mild obstructive sleep apnea. Exhibit 62F page 14.

Medical records from July 27, 2009 indicate that the claimant reported to the emergency room after experiencing pain in her groin. Exhibit 62F page 19. The record indicates that the claimant experienced pain in her left groin and leg and her right thigh for 3 days. The claimant stated that she went on a women's retreat and she had "done a lot of walking." Id.

On September 9, 2009, the claimant underwent another sleep study at Shands Hospital. Exhibit 65F. The results were interpreted by James Wynne, M.D., and he opined that they showed obstructive sleep apnea that was improved with continuous positive airway pressure. Id. page 13.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

First, looking at the claimant's allegations of pain under 20 CFR §416.929, I find that the claimant's allegations of pain are not consistent with the objective medical evidence and other evidence in this case. The claimant alleges that she suffers pain from migraine headaches, severe chest pain, severe lower back pain, severe abdominal pain, and shoulder pain. However, her activities of daily living are not as limited as one would expect them to be given her extensive alleged pain. As stated above, the claimant cooks, cleans her house, goes to church multiple times per week, does laundry, drives, writes poetry, teaches Bible study, goes shopping, conducts research on her home computer, takes care of her personal grooming, dresses herself, vacuums, cleans the bathroom, and attended school up until she earned her bachelor's degree in April, 2009. One example that shows how active the claimant is despite her alleged severe pain is her July 27, 2009 hospital visit. According to hospital records, the claimant stated that her pain on that occasion was likely caused by her doing a lot of walking at a women's' [sic] retreat the previous weekend. The claimant's level of activity is inconsistent with her allegations of pain.

Next, the claimant's complaints of concentration and memory problems are not consistent with the objective medical evidence and the other evidence in this case. The claimant would have me believe that she is unable to concentrate and that her schooling suffered as a result of this. However, I note that since her alleged onset date, her grade point average in school actually went up from a 2.3 the semester of her alleged onset date to over 2.7 at her graduation in April, 2009. While she was given a special accommodation for a test in early 2007, I note it was for efforts which failed prior to her alleged onset date. Further, not only did her grade point average go up, she was awarded her B.A. in psychology in April, 2009 with no indications of any further accommodations being provided. Therefore, I do not see any basis to the allegations that her concentration or memories have been adversely affected to any great degree. In fact, while the residual functional capacity limits her to "simple tasks and some moderately complex tasks," based on her school records, Exhibit 16E, I feel that the claimant is actually capable of "moderately complex tasks."

In sum, the above residual functional capacity assessment is consistent with the objective medical evidence and the opinions of the physicians discussed above. I do not discount al of the claimant's complaints, but I believe that the evidence demonstrates that the claimant's impairments are not of a level of severity that would prevent her from participating in substantial gainful activity, given the RFC set forth above. Given the objective medical evidence in the record, I find that the claimant's residual functional capacity is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of his [sic] symptoms.

Doc. 40-2 at 39-42.

Plaintiff argues that the ALJ erred in assessing her RFC. Plaintiff suggests that she has the RFC for less than the full range of sedentary work as found by the ALJ in the February of 2013 decision and that the RFC, found by ALJ Belcher, is not supported by substantial evidence. Doc. 81 at 1.

As noted above, the February of 2013 decision is not applicable here. Notwithstanding, substantial evidence supports the ALJ's RFC determination.

The RFC represents the most the claimant can do despite her limitations and is based on all of the relevant evidence of record. 20 C.F.R. § 404.1545(a). This includes the objective medical evidence, 20 C.F.R. § 404.1529(a), the medical opinions, 20 C.F.R. § 404.1527(b), and the statements of others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairments and related symptoms affect her ability to work. 20 C.F.R. § 404.1529(a). In considering the medical opinions, the ALJ should consider several factors. 20 C.F.R. § 404.1527(c); *see supra* at 8-10.

The ALJ considered the medical opinions in assessing Plaintiff's RFC, including the opinions of consultative examiner, Dr. Marrero, in October of 2007. Doc. 40-2 at 39-40. Among other findings, Dr. Marrero assigned Plaintiff a <u>Global Assessment of Functioning</u> (GAF) score of 75 and diagnosed somatization disorder. Doc. 40-2 at 39; Doc. 43-6 at 47.[8] Dr. Marrero administered a battery of objective tests that were

---

[8] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* <u>Nichols v. Astrue</u>, Case No.

considered by the ALJ.  Doc. 43-6 at 46.  Dr. Marrero also noted that Plaintiff was

working 12 hours per week at a childcare facility and previously employed at another

childcare facility working on a full-time basis, doc. 43-6 at 44, which is inconsistent with

disabling impairments.  *See* 20 C.F.R. § 404.1571.  Dr. Marrero's findings are

consistent with other observations in the record including that Plaintiff was regularly

alert, oriented, cooperative, and in no acute distress and also Plaintiff's reports of being

able to drive, get dressed, do chores, attend school, do homework, participate at

church, and work in a daycare.[9]  The ALJ afforded Dr. Marrero's opinion "great weight"

and the weight given is supported by substantial evidence.[10]  Doc. 40-2 at 40.

---

3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing GAF scale).  A GAF score of 71 to 80 indicates that if symptoms are
present, they are transient and expectable reactions to psycho-social stressors; no
more than slight impairment in social, occupational, or school functioning. *Id.* The
"Commissioner has declined to endorse the GAF scale for 'use in the Social Security
and SSI disability programs,' and has indicated that GAF scores have no 'direct
correlation to the severity requirements of the mental disorders listings.'" Wind v.
Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-
65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped
from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including
symptoms, suicide risk, and disabilities in its descriptors) and questionable
psychometrics in routine practice.  In order to provide a global measure of disability, the
WHO DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

[9]  The ALJ may consider a claimant's daily activities when evaluating the
claimant's subjective complaints of disabling pain and other symptoms.  Macia v.
Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see*
Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday
activities of short duration, such as housework or fishing" does not disqualify a claimant
from disability).

[10]  On November 27, 2007, Dr. Marrero explained the evaluation results to
Plaintiff.  Doc. 43-6 at 43.  It appears Plaintiff's concussion of February 8, 2006, was
mild.  *Id.* at 43.  Plaintiff's scores on the evaluation "revealed impaired cognition
disproportionate with a mild concussion.  That is, the overall results were more
equivalent with someone who had experienced severe traumatic brain injury.  She

The ALJ also considered the opinion of reviewing physician Vaduvur Narayan, M.D. Doc. 40-2 at 40; Doc. 44-2 at 5-12. In May 2008, Dr. Narayan opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk about six hours each in eight-hour day; avoid moderate exposure to hazards, such as machinery or heights; avoid concentrated exposure to noise; and never climb ladders, ropes, or scaffolds. *Id.*

The ALJ afforded Dr. Narayan's opinion "great weight." Doc. 40-2 at 40. Dr. Narayan noted that despite Plaintiff's multiple symptoms, the record lacked supporting objective medical evidence. *See* doc. 44-2 at 6-7, 10-11. For example, Plaintiff consistently had clear lungs, normal bowel sounds, good pulses, full range of motion, and normal heart rate and rhythm. She was also negative for abnormalities based on diagnostic imaging, including x-rays, computed tomography, electrocardiography, and other testing.

The ALJ considered the opinion of Dr. Chodosh who performed a consultative physical examination of Plaintiff in January of 2008. Doc. 40-2 at 40; Doc. 43-6 at 90-93. Dr. Chodosh noted that Plaintiff's responses to examination were generally normal, although she had limited range of motion in her back. Doc. 43-6 at 86-88, 92. Dr. Chodosh opined "based only on objective evidence" that Plaintiff is able to stand, walk, sit, stoop, squat, kneel, lift and carry, handle objects, see, hear, and speak normally. Doc. 43-6 at 93. The ALJ did not give full weight to Dr. Chodosh's opinion and did not believe Plaintiff was as limited as she claims. Doc. 40-2 at 40.

---

seemed to be disappointed with this result, reporting continued residual problems with academic demands that were not present prior to her fall and mild concussion." *Id.*

The ALJ also considered the opinion of treating physician Dr. Williams who diagnosed Plaintiff with left benign paroxysmal positional vertigo. *Id.*; doc. 44-1 at 8. (Dr. Narayan considered Plaintiff's vertigo. Doc. 44-2 at 7.) In April of 2008, Dr. Williams completed a request for work form and opined that Plaintiff could return to regular work with no limitation on the maximum number of hours that Plaintiff could work in a day. Doc. 44-1 at 6.

Substantial evidence supports the ALJ's consideration of the medical source opinions and the weight afforded.

The ALJ also considered Plaintiff's subjective complaints in assessing her RFC. 20 C.F.R. § 404.1529(a). The ALJ should consider several factors in evaluating the claimant's subjective complaints, including the claimant's daily activities. 20 C.F.R. § 404.1529(c)(3)(i).

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)); Moore v. Barnhart, 405 F.3d at 1212 ("credibility determinations are the province of the ALJ"). If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson, 284 F.3d 1225. Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *Id.* On the other hand, "[a] clearly articulated finding with substantial supporting

evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67

F.3d 1553, 1562 (11th Cir. 1995).

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.  One

begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225; see Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); 20

C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e)

(regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to

evaluate the claimant's subjective pain testimony because it is the medical model, a

template for a treating physician's evaluation of the patient's experience of pain.[11]

The ALJ found that although Plaintiff had impairments that could reasonably be

expected to cause her alleged symptoms, the record show that her statements

concerning the intensity, persistence, and limiting effects of her impairments were not

entirely credible.  Doc. 40-2 at 41-42.  This included evidence of her daily activities.

Doc. 40-2 at 41.  Plaintiff continued to cook, clean, drive, do laundry, attend church,

teach Bible study, shop, vacuum, and clean the bathroom despite alleging disability.

She also continued to attend school and earn a college degree.  See supra n.9.

---

[11]  Although the ALJ did not expressly refer to the three-part part standard, it is
clear that the ALJ's findings, discussion, and citation to 20 C.F.R. § 416.929, doc. 40-2
at 41, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226; see also
doc. 40-2 at 7 (ALJ citing 20 C.F.R. § 404.1529).

The ALJ also considered Plaintiff's complaints of concentration and memory problems that were inconsistent with the objective medical evidence and other evidence including Plaintiff's relative success in increasing her grade point average in college and ultimate receipt of a B.A. in psychology in April of 2009. Doc. 40-2 at 41. The ALJ's RFC assessment limited Plaintiff to "simple tasks and some moderately complex tasks," doc. 40-2 at 38, although he felt that Plaintiff "is actually capable of 'moderately complex tasks.'" Doc. 40-2 at 41.

In summary, the ALJ considered and did not discount all of Plaintiff's complaints. Rather, he believed "that the evidence demonstrates that the claimant's impairments are not of a level of severity that would preclude her from participating in substantial gainful activity, given the RFC" assessment. Doc. 40-2 at 42.

Overall, substantial evidence supports to ALJ's RFC assessment and his assessment of Plaintiff's credibility.

### 5.

At step four, the ALJ also determined that "[t]he claimant is unable to perform any past relevant work" as a secretary, a case manager, and a child care worker. Doc. 40-2 at 42, 85. The ALJ agreed with the vocational expert who opined that Plaintiff "is unable to perform past relevant work. *Id.*

### 6.

Prior to making a step five determination, the ALJ found that Plaintiff has at least a high school education (actually a college degree) and is able to communicate in English. Doc. 40-2 at 42. The ALJ also found that Plaintiff has acquired work skills from past relevant work as a case manager that was skilled with a specific vocational

preparation (SVP) code of seven that required several skills including speaking,

reading, comprehension, writing, active listening, and problem identification. *Id.*

At step five, the ALJ determined that Plaintiff had acquired work skills from past

relevant work that are transferable to other occupations with several jobs existing in

significant numbers in the national economy. *Id.* To this end, the ALJ consulted the

vocational expert and made the following findings:

> The claimant was 42 years of age on the alleged onset date of disability,
> February 8, 2007, and she is currently 45 years old with a birth date of June 20,
> 1964. She has a bachelor's degree, and past relevant work as described above.
> The vocational expert was asked if any occupations exist which could be
> performed by an individual with the same age, education, past relevant work
> experience, and residual functional capacity as the claimant, and which require
> skills acquired in the claimant's past relevant work but no additional skills.
> The vocational expert responded and testified that representative occupations
> such an individual could perform include: data examination clerk, DOT code is
> 209.387-022, described as unskilled, sedentary exertional level job with an SVP
> of 3 and there are 850 such jobs in the region and 220,000 in the national
> economy; cashier, DOT code is 211.462-026, described as unskilled, sedentary
> exertional level job with an SVP of 3 and there are 800 such jobs in the region
> and 130,000 in the national economy; telephone solicitor, DOT code is 299.357-
> 014, described as unskilled, sedentary exertional level job with an SVP of 3 and
> there are 800 such jobs in the region and 130,000 in the national economy. The
> vocational expert defined "the region" as the southeastern United States as
> defined by the Department of Labor.
>
> Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the
> information contained in the Dictionary of Occupational Titles.
>
> Accordingly, although the claimant's additional limitations do not allow the
> claimant to perform the full range of sedentary work, considering the claimant's
> age, education and transferable work skills, a finding of "not disabled" is
> appropriate under the framework of Medical-Vocational Rule 201.29.

Doc. 40-2 at 43; *see* doc. 40-2 at 81-87.

The ALJ ultimately determined that Plaintiff was not under a disability at any time

from February 8, 2007, through the date of the ALJs decision of April 23, 2010. Doc.

40-2 at 43-44.

7.

In summary, the ALJ considered the relevant evidence for the time period in question--February 8, 2007, through April 23, 2010.  The Court notes well that Plaintiff has appeared pro se and without the benefit of counsel in this Court, although she was represented by counsel before the ALJ.  The ALJ appropriately applied controlling law to the facts and his findings are supported by substantial evidence.  As a result, Plaintiff has not demonstrated that the ALJ erred in reaching his conclusion that Plaintiff is not disabled during the relevant period.

## IV.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence in the record and he correctly followed the law.  Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for DIB be **AFFIRMED** and judgment entered for the Commissioner.

**IN CHAMBERS** at Tallahassee, Florida, on January 14, 2014.


**s/  Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**